## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

| | |
|---|---|
| SAMUEL HARRY SCHICCATANO,    ) | |
|                        ) | |
|      Petitioner,           ) | |
|                        ) | |
| v.                          ) | Civil Action No.  3:23-cv-54–HEH |
|                        ) | |
| HAROLD W. CLARKE,         ) | |
| DIRECTOR,              ) | |
|                        ) | |
|      Respondent.        ) | |

### MEMORANDUM OPINION
### (Granting Respondent's Motion to Dismiss)

THIS MATTER is before the Court on Petitioner Samuel Harry Schiccatano's ("Schiccatano") petition for a writ of habeas corpus under 28 U.S.C. § 2254 ("§ 2254 Petition," ECF No. 1), filed on January 24, 2023. Schiccatano, a former Virginia inmate proceeding with counsel, challenges his convictions in the Circuit Court of Prince William County (the "Circuit Court"). Respondent moved to dismiss the Petition on March 15, 2024. (ECF No. 10.) Schiccatano filed no response. For the reasons that follow, the Motion to Dismiss will be granted.

### I. PROCEDURAL HISTORY

After a jury trial in 2015, Schiccatano was convicted of rape and object sexual penetration and the Circuit Court sentenced him to twenty-three (23) years of imprisonment with eighteen (18) years suspended. (*See* ECF No. 1, at 2.) Schiccatano appealed, and amongst other claims, challenged the sufficiency of the evidence arguing that "the evidence was insufficient to prove that the victim was mentally incapacitated or

physically helpless at the time of the incident, or that he had reason to know that the victim was in such condition." (ECF No. 12-1, at 6.)[1] The Court of Appeals of Virginia aptly summarized the evidence of Schiccatano's guilt as follows:

> On April 20, 2012, the victim went to the home of appellant, whom she met online though a Craigslist advertisement he had placed. Through emails, appellant and the victim made plans for her to come to his home, have dinner and drinks, and go to a karaoke bar. The victim had learned appellant was an elementary school teacher, so she felt it was safe to go to his home.
>
> When the victim arrived at about 8:00 p.m., appellant was wearing only a towel and appeared surprised that she had come. The victim inadvertently had given appellant an incorrect telephone number. In any event, appellant and the victim decided to carry through with their prior plans for the evening. After appellant dressed, he and the victim went shopping for groceries and alcohol. They returned to appellant's home. He mixed drinks while she cooked hamburgers. After eating dinner and having one margarita each, the two played pool with the terms that the loser would take a shot of Jägermeister. The victim lost two games and consumed two shots of liquor.
>
> While they were playing pool, Carol Farmer, appellant's friend arrived. She started drinking and playing pool and was friendly to the victim. Appellant went upstairs for a period of time, then returned and smoked marijuana while Farmer and the victim continued the pool game. Appellant prepared margaritas for the three of them to have while they walked to the karaoke bar. The victim testified that her drink was too strong, so she poured it into appellant's cup.
>
> Once they reached the bar, the victim had a beer. Appellant appeared withdrawn, so the victim and Farmer talked to each other and other people at the bar. While they were in the bathroom together, Farmer told the victim that appellant thought the victim was "into girls." Farmer also said that she and appellant had had a sexual relationship. Later, the victim tried to kiss the appellant, but he pulled away. After that, the victim did not talk much to appellant. The victim testified that at this point in the evening she was slurring her words and she felt completely intoxicated.

---

[1] The Court employs the pagination assigned by the CM/ECF docketing system. The Court omits the emphasis from the parties' submissions. The state courts refer to the victim, as either the "the victim," or "A.G." Schiccatano and state habeas counsel refers to the victim by her full name. Here, the Court refers to her as "the victim" in quotations from the state court record.

The bar closed, and the victim started walking with Farmer and appellant to appellant's residence. The victim stated she was stumbling and relying on Farmer to stay upright. The victim described Farmer and herself as being "very drunk." At Farmer's insistence, Farmer, appellant, and the victim engaged in a "triple kiss." The victim had no other memory of the walk to appellant's house.

The victim remembered that after they reached appellant's home she vomited while outside on the deck. Some of the vomit got on the victim's shirt. She remembered being in the bathroom with her head in the toilet. Her next memory was being on the bathroom floor and someone removing her shoes, socks, jeans, and underwear. The victim awakened briefly to the feeling of a cold hard object inserted into her vagina from behind. The object felt like a finger. The victim stated she was so incoherent that she could not even open her eyes. After perhaps passing out yet again, the victim felt a penis in her vagina, inserted from behind. She then heard a male behind her masturbating. She remembered being cold on the bathroom floor, and someone placing a towel over her.

The victim awakened on the bathroom floor at about 5:00 a.m. She dressed quickly and fled from the home. Before she left, she saw appellant and Farmer on his bed asleep. The victim went to car and called the police.

The police went to appellant's home and arrested him. On appellant's cellular telephone were two pictures of the victim in the bathroom of appellant's home. In the photographs the victim is crouching in front of the commode with her head inside it. The photographs were taken at about 3:00 a.m. on April 21, 2012.

The police took the victim to INOVA Fairfax Hospital for examination by a sexual assault nurse. Diana Burkhart, who performed the examination, noted abrasions and tears to the victim's genitalia. The injuries appeared to be fresh. A sample of fluid was taken from the victim's cervix. Appellant could not be excluded as the donor of the DNA material found in the sperm fraction of the sample.

Detective Heather Younce interviewed appellant on the morning of April 21, 2012. Appellant said that he and the victim had communicated by email for about a week, and he invited her to his home for dinner and to go to a karaoke bar. However, appellant was surprised when she came on the appointed evening because she had not provided him with a correct telephone number. Nevertheless, appellant and the victim went shopping for groceries and liquor, and then returned to his home and had dinner. Appellant and the victim each consumed several shots of Jägermeister. Farmer then arrived. Farmer and the victim talked, and the three of them consumed more drinks and shots of alcohol. Eventually, they walked to a karaoke bar nearby. While there the victim tried to kiss the appellant, but he rebuffed the advance because, he said, she "wasn't my type." After closing time, on the way back

to appellant's home, Farmer and the victim were kissing, engaging in sexual contact, and trying to get appellant involved in "triple kissing." The females were talking about having a "threesome" with appellant, which appealed to him. Once they reached appellant's home, all three of them had more shots of alcohol. The victim vomited while outside on appellant's deck. Appellant, Farmer, and the victim went into the bathroom to have the "threesome" in case the victim got sick again. Appellant took a picture of the victim with her head in the toilet and vomiting. Appellant said that he got aroused after he and Farmer started kissing. He and Farmer removed the victim's pants. Appellant said he "fingered" the victim and she made sounds indicating she enjoyed it. He said the victim's eyes were both open and closed, and she did not appear to be unconscious. While watching the females touch each other, appellant masturbated and then ejaculated. Eventually, appellant put a towel over the victim, left the bathroom, and joined Farmer on the bed.

Testifying in his own behalf, appellant stated that while at the bar the victim appeared to be having fun and interacting with people, but she was not drunk. When the victim tried to kiss him and he pulled back, the victim said she would "get [him] later." While still at the bar, appellant, Farmer, and the victim engaged in a triple kiss, at the victim's suggestion. According to appellant, while walking back from the bar Farmer and the victim were kissing and fondling each other. Eventually, all three of them were touching each other, first over and then under their clothes. The victim mentioned having a "threesome" in appellant's bed. Appellant said he observed no behavior to indicate the victim or Farmer was very intoxicated. Once they reached appellant's home, appellant, the victim, and Farmer each had a shot of alcohol, but the victim did not like the taste. The victim went out to the deck and spit up the drink. The victim suggested that they all get in the bathtub together. They went to the bathroom, and all began touching each other again. At some point, appellant left the bathroom and changed into shorts. When he returned, the victim's head was in the toilet. Afterward, appellant engaged in sexual contact with the victim and Farmer and he masturbated. Appellant, ejaculated, then engaged in more touching with the two females. Farmer left the bathroom. The victim's pants had been removed. Appellant and the victim went to the floor, and he inserted his finger into the victim's vagina. The victim made sounds of enjoyment. Appellant denied putting his penis in the victim's vagina.

Farmer testified that the victim was not slurring her words and did not appear intoxicated on the night of the incident. She also described the victim as the one who was aggressively pursuing sexual contact with Farmer and appellant. However, when initially interviewed by the police on the morning of April 21, 2012, Farmer said she could not recall anything that happened after the group was at the bar because she had been too intoxicated.

(*Id.* at 2–6 (alteration in original).)  The Court of Appeals of Virginia concluded that "the evidence was sufficient to prove beyond a reasonable doubt that the victim was mentally incapacitated or physically helpless during the sexual contact with appellant in the bathroom, that he knew or should have known of the victim's condition, and that he was guilty of rape and sexual penetration with an object." (*Id.* at 7.)  Accordingly, the three-judge panel denied the petition for appeal. (*Id.* at 1.)  The Supreme Court of Virginia refused the petition for appeal. (ECF No. 12-2, at 1.)

Schiccatano filed a writ of habeas corpus in the Circuit Court asserting sixteen (16) claims of ineffective assistance of counsel. (ECF No. 13-5, at 4–50; ECF No. 13-3, at 1–37.)[2]  By Final Order entered on August 20, 2020, the Circuit Court denied the habeas petition. (ECF No. 13-9, at 40.)  The Supreme Court of Virginia subsequently refused the petition for appeal. (ECF No. 13-2.)

In his § 2254 Petition, Schiccatano demands relief upon the following grounds that were both raised in the state courts:

> Claim A:   Schiccatano was denied the effective assistance of counsel when "[c]ounsel failed to obtain and present evidence of [the victim's] 911 call made within an hour of her claim that she was sexually assaulted." (ECF No. 1, at 22.)

---

[2] The record Respondent uploaded to CM/ECF as attachments to the Brief in Support is difficult to follow. Documents are uploaded out of order and piecemeal. This requires the Court to jump around to review complete documents complicating its assessment. For example, the beginning of Schiccatano's habeas petition filed in the Circuit Court begins at ECF No. 13-5 and concluded at ECF No. 13-3. Counsel for Respondent is reminded in the future to check to ensure that he has upload his attachments in a manner that is comprehensible.

Claim B:     Schiccatano was denied the effective assistance of counsel when "[c]ounsel failed to present expert testimony of [the victim's] level of intoxication (and argue these facts to the jury)." (*Id.* at 33.)

Respondent asserts that, as the state courts correctly determined, Schiccatano's claims lack merit. As discussed below, the Court discerns no unreasonable determination of law or fact with respect to that conclusion.

## II. APPLICABLE CONSTRAINTS UPON HABEAS REVIEW

In order to obtain federal habeas relief, at a minimum, a petitioner must demonstrate that he is "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The Antiterrorism and Effective Death Penalty of 1996 ("AEDPA") further circumscribes this Court's authority to grant relief by way of a writ of habeas corpus. Specifically, "[s]tate court factual determinations are presumed to be correct and may be rebutted only by clear and convincing evidence." *Gray v. Branker*, 529 F.3d 220, 228 (4th Cir. 2008) (citing 28 U.S.C. § 2254(e)(1)). Additionally, under 28 U.S.C. § 2254(d), a federal court may not grant a writ of habeas corpus based on any claim that was adjudicated on the merits in state court unless the adjudicated claim:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). The Supreme Court has emphasized that the question "is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro v.*

6

*Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams v. Taylor*, 529 U.S. 362, 410

(2000)).  Given the foregoing restrictions, the findings of the Circuit Court figure

prominently in this Court's opinion.

## III.    INEFFECTIVE ASSISTANCE OF COUNSEL

To demonstrate ineffective assistance of counsel, a convicted defendant must first

show that counsel's representation was deficient, and, second, that the deficient

performance prejudiced the defense.  *Strickland v. Washington*, 466 U.S. 668, 687

(1984).  To satisfy the deficient performance prong of *Strickland*, a convicted defendant

must overcome the "'strong presumption' that counsel's strategy and tactics fall 'within

the wide range of reasonable professional assistance.'"  *Burch v. Corcoran*, 273 F.3d 577,

588 (4th Cir. 2001) (quoting *Strickland*, 466 U.S. at 689).  The prejudice component

requires a convicted defendant to "show that there is a reasonable probability that, but for

counsel's unprofessional errors, the result of the proceeding would have been different.

A reasonable probability is a probability sufficient to undermine confidence in the

outcome."  *Strickland*, 466 U.S. at 694.  In analyzing ineffective assistance of counsel

claims, the Court need not determine whether counsel performed deficiently if the claim

is readily dismissed for lack of prejudice.  *Id.* at 697.

## IV.  ANALYSIS

### A. Ineffective Assistance with Respect to the 911 Call

In Claim A, Schiccatano contends that he was denied the effective assistance of

counsel when "[c]ounsel failed to obtain and present evidence of [the victim's] 911 call

made within an hour of her claim that she was sexually assaulted."  (ECF No. 1, at 22.)

The 911 call was not used at trial and was not obtained until counsel filed Schiccatano's state habeas. (*Id.* at 12.) Schiccatano contends that the call was made within an hour of the crime and that it would have "assist[ed] the defense in showing" that the victim was not so intoxicated as to be mentally incapacitated and physically helpless and incapable of giving her consent, or whether Schiccatano knew or should have known that she was either. (*Id.* at 22–23.) Counsel characterizes the 911 call as "highly significant evidence" of this fact. (*Id.* at 5.) As discussed below, there is no reasonable probability that the introduction of the 911 call would not have changed the jury's finding of guilt.

### 1. State Court's Decision

The Circuit Court held a hearing on Schiccatano's habeas petition where the "primary argument [was] about the 911 call." (State Habeas Record at 33.)[3] The Circuit Court denied the petition from the bench. (*See id.* at 20.) The Circuit Court later entered a Final Order memorializing the Court's ruling and addressing this claim in a thorough written opinion. (*See id.*)

At the beginning of the hearing, the Circuit Court explained that it had "listened to the 911 recording and . . . also read the transcript of that." (*Id.* at 31.) In rejecting the claim from the bench, the Circuit Court explained:

> So the first prong of *Strickland*, was it objectively unreasonable for defense counsel not to subpoena the 911 tape. Or asking it another way, would some attorneys have asked for the tape, maybe. I do not find that it was objectively unreasonable not to.

---

[3] The Circuit Court provided a continuously paginated record of its proceedings for the state habeas, *see Schiccatano v. Clarke*, No. CL18001471-00 (Va. Cir. Ct). The Court employs this pagination and refers to the record as "State Habeas Record."

911 recordings are not - - every crime is not committed through a call to 911, the tapes don't always exist. I just don't find that that was objectively unreasonable.

However, the more important part of this analysis is was there reasonable probability that but for defense counsel's error, if any, would the outcome have been different.

So, as I said, I listened to the tape and I read the transcript of it. The highlights of the tape from my perspective are that the victim's speech was clear and coherent at the time of the call, that was however after she had woken up or we might say sobered up or metabolized enough of the alcohol. So certainly at that point she had.

She however admitted intoxication. She admitted that she was still intoxicated and admitted she could not drive.

Were there discrepancies, yes, there were some minor discrepancies. However, the Court believes that overall her testimony would simply have bolstered, or the 911 tape simply would have bolstered her testimony at trial. And I'll put into the record now and read from the transcript of that call a few excerpts to illustrate what I'm talking about.

She says at time stamp 1:15, "While I was asleep and he started having sex with me without me being really awake [sic] of it at all."

At time stamp 3:33, "I threw up because I had a few too many drinks and later on he came in and he started having sex with me."

And at time stamp 4:25, "I was partially conscious. There was no reaction on my part. Even it didn't register to me to do anything because it was so far back in my mind I guess because I was so asleep or unconscious."

And at time stamp 5:26, "I didn't even know what was happening."

So, all that said, I can't say that there would have been a reasonable probability that but for the absence of the 911 recording the outcome of this trial would have been different. The Court therefore sustains the motion to dismiss and the petition for a writ of habeas corpus is dismissed with prejudice.

(State Habeas Record at 64–66.)

In the written opinion finding Claim A lacked merit, the Circuit Court further explained as follows:[4]

---

[4] Because the Circuit Court summarily refused Schiccatano's petition for appeal, the Court presumes that the Supreme Court of Virginia refused the claims for the reasons stated by the Circuit Court. *Wilson v. Sellers*, 584 U.S. 122, 125 (2018).

In claim VIII, the petitioner alleges that counsel was ineffective for failing to "obtain a copy of the 911 call from [the victim] to the police." The petitioner argued that claim VIII is the "principal claim of ineffectiveness of trial counsel." (Reply at 1.) The petitioner argued that allegedly inconsistent statements made by the victim in the 911 call are sufficient to establish a reasonable probability of a different outcome at trial if the tape had been played for the jury. This claim is without merit. In his petition, Schiccatano initially failed to proffer the 911 tape and failed to proffer what was on the tape. However, as a result of a subpoena *duces tecum*, it was revealed that the police had retained a copy of the 911 call. A reasonable attorney, not knowing the contents of the 911 call, would not have sought to obtain the tape. By the time counsel was retained in this case, the petitioner had already made incriminating statements to the police regarding the amount of alcohol consumed. He also told the police he did not have intercourse with the victim, a statement that was directly contradicted by the SANE examination. Likely as a result of these circumstances, counsel developed a defense theory of consent. Surely, counsel was already aware that the victim had called the police. A reasonable counsel, given the facts of this case, could conclude that there was nothing helpful to be gained by seeking the 911 tape. "In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 691. Moreover, counsel could also reasonably conclude that the recording might contain damaging evidence, of which the Commonwealth might not be aware. Indeed, the prosecuting attorney in this case was unaware that the police had retained a copy of the 911 call. (*See* Commonwealth Attorney's Response to Subpoena *duces tecum*).

Even knowing what was on the 911 call, a reasonable attorney would not seek to use the tape at trial. The 911 call was consistent with the victim's testimony at trial. This evidence would have emphasized the victim's telling of the events was consistent from the time of the rape all the way through trial. This would have been harmful to the defense, as the petitioner's version of the events changed dramatically from the morning after the rape to the time of trial.

The petitioner asserted that the recording could have been used to impeach the victim regarding (1) whether she was awake at the time of the assault, (2) whether she knew who took her clothes off and in what detail, and (3) whether she "had the sufficient cognitive and intellectual capacity to comprehend or appreciate the detailed sexual nature of the act." (Resp. at 12.) This claim is without merit. The 911 tape would not have created a reasonable probability of a different outcome at trial.

On the 911 call, the victim called the police and stated, "I would like to report a rape." (Ex A at 1)[00:05]. She related to the dispatcher that "I

had a few too many drinks, got a little sick in the bathroom.  Uh, while I was in the bathroom, I kind of, you know just uh . . . fell asleep.  Came in, he came in, I'm sorry, and um while I was asleep and he started having sex with me without me being uh, really aware of it at all." (Ex. A at 2 [0:15]).  The following exchanges also occurred between the 911 operator and the victim [4:00 – 5:20]:

| | |
|---|---|
| Operator: | Okay.  Were, did you tell him not to have sex with you at any point, or . . .? |
| V: | I was not even capable of that.  [. . .] |
| Operator: | [. . .]  But I'm trying to understand what happened with, like were conscious?  Like were you awake while you were having sex with him, or . . .?" |
| V: | [. . .] I was partially conscious.  Uh, he did not know that I was conscious.  I mean, there was no reaction on my part.  Um . . .  I was only conscious to the previous, before he came in I was asleep.  Um, when he came in, I guess he must have woken me up.  And, um . . . I just didn't even, it didn't even register to me to – to do anything because, it was uh . . . so far back in my mind.  I guess, because I was so asleep or so . . . unconscious, and I'm so embarrassed that this happened. [. . .] |
| Operator: | Okay.  So you were too drunk to realize you could say no?  Is that what you're saying?  Like, you're out of it from being drunk, or . . .? |
| V: | I, yeah.  I mean, I . . . I-I didn't even know what was happening, I think is what it was. [. . .] |

As the transcript of the 911 call reflects, the victim never stated she was awake at the time of the assault.  She said she was "partially conscious," "was sleep," "was so asleep or unconscious" and that "it didn't register to me" and "didn't even know what was happening."  None of these statements could have been used to impeach the victim's testimony.  The victim's testimony at trial was clear that she was in and out of consciousness during the sexual assault.  (T. 1/20/2015 at 208–213.)  There were moments when she would awake and was able to sense she was being assaulted. (Tr. 1/20/2015 at 210–212).

A reasonable attorney would not risk having a jury listen to the victim telling her consistent story again, hoping that it would not listen to the words she was saying but only listen to how she was speaking and then, based on that alone, find her not credible.  Had counsel played the tape for the jury, the petitioner would now be arguing that trial counsel was ineffective for

11

playing a tape where the victim had the opportunity to recount the events of the rape without being subject to cross-examination. *See generally Goodson*, 564 F.2d [1071,] 1072 [(4th Cir. 1977)]. The tape contains no evidence that creates a reasonable probability of a different outcome. For the above reasons, and the reasons stated to the record at the February 6, 2020, motions hearing, the petitioner has failed to establish either deficient performance or prejudice as required by *Strickland* and claim VIII must fail.

(ECF No. 13-9, at 28–31 (paragraph numbers omitted).) The Court discerns no unreasonable application of the law or an unreasonable determination of the facts in the Circuit Court's rejection of this claim. *See* 28 U.S.C. § 2254(d)(1)–(2).

### 2. There is No Prejudice to Schiccatano

The Court has reviewed both the audio and the transcript of the victim's 911 call and sees no need to repeat the contents of the victim's 911 call here at any great length. As the Circuit Court aptly explained, the 911 call was consistent with the victim's testimony at trial and if counsel had obtained the recording and played it at trial, it would have reinforced the victim's testimony that she was not fully awake or conscious at the time Schiccatano penetrated her with his finger and penis. If the tape had been played at trial, the jury would have heard that the victim was "report[ing] a rape," was still drunk and unable to drive, that she vomited and fell asleep, and that Schiccatano had sex with her when she was asleep and[/]or in and out of consciousness and she was not "really aware of it at all." (State Habeas Record at 183–84.) The jury would have heard that she was not capable of saying no, and that "[Schiccatano] did not know that [she] was conscious" because "there was no reaction on [her] part," and that "it didn't even register to [her] to-to do anything because, it was uh . . . so far back in my mind, I guess, because I was so asleep or so . . . unconscious." (*Id.* at 185.) As the 911 call shows, the victim

12

clearly indicated to the operator that she was so mentally incapacitated or physically helpless that she was unable to consent to the sexual activity.

During trial, several years later,[5] the victim testified consistently with her 911 call. The victim had clearly not listened to the recording of the call in the intervening years because no one knew it had been retained by police.  The victim admitted that she felt drunk at the bar and that she tried to kiss Schiccatano.  (ECF No. 14-5, at 1–2.)  She testified that she was stumbling and incoherent on the walk home but remembered engaging in a triple kiss with Farmer and Schiccatano.  (*Id.* at 3–4.)  The next thing the victim remembered was vomiting over the railing of Schiccatano's back deck and Farmer giving her crackers.  (*Id.* at 5.)  After that, the victim remembered being in the bathroom with her head in the toilet, but she did not know how she got to the bathroom because she was "passed out."  (*Id.* at 5, 6.)  The victim testified that she was in and out of sleep or "passed out," but remembered her shoes, socks, jeans, and underwear being taken off. (*Id.* at 7–10.)  She explained that she could not see who was removing her clothes because she "couldn't even open [her] eyes."  (*Id.* at 8.)

The next thing the victim remembered was, as she was lying on her side, "waking up feeling something cold and hard being inserted into her vagina" and "it felt like it was a finger."  (*Id.* at 10, 12.)  The victim testified that she was so incoherent, she could not move or do anything.  (*Id.* at 11.)  She explained that, "the next thing [she] remember[ed]

---

[5] The incident occurred on April 20, 2012, and the trial did not begin until January 20, 2015. (*See* Pet. at at 6.)

was what felt like a penis entering [her] vagina" and then sounds like the person was "behind [her] masturbating" and groaning. (*Id.* at 11.)

Schiccatano attempts to highlight the inconsistencies in the victim's testimony about who took her clothes off, when she was asleep and not asleep, and nitpicks at her description of whether she was drunk or simply "had a few too many drinks." (ECF No. 1, at 71–76.)  However, both the 911 call and the victim's testimony at trial years later, reflect that the victim consistently stated that she was too mentally incapacitated or physically helpless to be able to consent to digital penetration or sex with Schiccatano because she was in and out of consciousness during that time.[6]  On the other hand, Schiccatano's testimony changed significantly over time from a night where "everybody was so drunk that [he] didn't think that anybody knew what was going on." (ECF No. 16-2, at 20), to painting the victim as the sexual aggressor who did not appear intoxicated and was cognizant of her actions.  For example, Schiccatano initially told Detective Younce, in his statement made the same day as the crime, that he and the victim were extremely intoxicated, but at trial he changed his testimony and stated that the victim showed no apparent signs of inebriation and drank four or five drinks, which is the same amount of alcohol that the victim testified that she had consumed.  Schiccatano

_____

[6] Schiccatano suggests that on the 911 call, the victim indicated "that she pretended to be asleep, that she was aware that she was having sex, and that no force was used." (ECF No. 1, at 28.) The victim never stated that she said she pretending to be asleep.  At most she stated that she was "partially conscious" and that "[Schiccatano] did not know that [she] was conscious" because "there was no reaction on [her] part," and that "it didn't even register to me to-to do anything because, it was uh . . . so far back in my mind, I guess, because I was so asleep or so . . . unconscious." (State Habeas Record at 186.)

told the officers who came to his house, that the victim vomited off his deck after the bar, but at trial changed his testimony to suggest that she merely "spit out some fireball." (ECF No. 16-2, at 6–7.)  Schiccatano also testified that the victim did not vomit in the bathroom, but then later agreed that he told the officers, who came to the scene, that he went into the bathroom to make sure she that she was okay and that she was "unconscious on the bathroom floor" and that he "helped her to her side so that if she vomited again, she wouldn't choke." (ECF No. 16-2, at 11.)  As early as the end of his interview with Detective Younce, Schiccatano realized that the events of the evening as relayed by him sounded damning, and he stated: "If I can't prove consent, I'm not going to be a teacher anymore." (ECF No. 16-2, at 27.)

Clearly, the consumption of alcohol prior to the rape and object sexual penetration resulted in vastly different accounts of the night from Schiccatano and the victim. However, the question before the Court is not whether the evidence was sufficient to find Schiccatano guilty of these crimes.[7]  Rather, the question the Court must answer in Claim A is whether there is a reasonable probability that but for counsel's failure to introduce the 911 call at trial the jury would have found Schiccatano innocent.  The Court concludes that it would not have.  Instead, the submission of the 911 call would have

---

[7] That question was answered in the affirmative by the jury.  The jury heard Schiccatano's initial statement to police, the victim's testimony, and then Schiccatano's testimony in his defense and clearly found the victim's testimony about her incapacitation and her inability to consent to be more credible.  While Schiccatano does not raise a challenge to the sufficiency of the evidence here, even if he had, this Court sitting in habeas has "no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them." *Cagle v. Branker*, 520 F.3d 320, 324 (4th Cir. 2008) (citation omitted).

allowed the jury to hear once again that a few hours after the object sexual penetration

and rape, the victim reported that she was too mentally incapacitated or physically

helpless to consent, and that Schiccatano knew or had reason to know this.

To the extent that Schiccatano argues that the victim did not sound drunk at the

time of the 911 call which was only around two hours after the sexual assault and rape

(*see* ECF No. 1, at 28–29), this does not change the calculus. Even if the victim's

"words, actions, and demeanor on the 911 call demonstrated awareness, cognition and

consciousness" (*id.* at 28 (emphasis omitted)) as discussed previously, playing the 911

call for the jury would have been prejudicial to Schiccatano. The victim's statement to

the operator would have reinforced the victim's testimony at trial that she was too

incoherent to consent to sex or object penetration. The jury would have also heard her

tell the operator twice that she was inebriated at the time of that 911 call and could not

drive home which would not help Schiccatano's position that the victim had not

consumed an excessive amount of alcohol. (State Habeas Record at 183, 185.)

In sum, Schiccatano fails to "show that there is a reasonable probability that, but

for counsel's unprofessional errors, the result of the proceeding would have been

different." *Strickland*, 466 U.S. at 694. Thus, the Court discerns no unreasonable

application of the law or an unreasonable determination of the facts in the Circuit Court's

reasoned rejection of this claim. *See* 28 U.S.C. § 2254(d)(1)–(2). Accordingly, Claim A

will be dismissed.

## B. Ineffective Assistance for Failing to Hire Toxicologist

In Claim B, Schiccatano argues that he was denied the effective assistance of counsel when "[c]ounsel failed to present expert testimony of [the victim's] level of intoxication (and argue these facts to the jury)." (ECF No. 1, at 33.) Schiccatano contends that, before trial, counsel knew that the prosecution's theory was that the victim "was too intoxicated to consent (i.e., she was so intoxicated that it rendered her "mentally incapacitated" or "physically helpless"). (ECF No. 1, at 33.) Schiccatano argues that counsel should have investigated whether there was any evidence showing that the victim was not as intoxicated as she claimed to be, and for Schiccatano's state habeas petition, counsel hired a Dr. Nicholas Lappas, Ph.D. to assess the victim's blood alcohol level based on her testimony of how many drinks she consumed. (*See id.* at 21; State Habeas Record at 1110.) In rejecting this claim, the Circuit Court found:

> Schiccatano asserts that counsel was ineffective for failing to introduce "mitigating" evidence at trial. Specifically, the petitioner appears to argue that counsel should have produced testimony or evidence that, based on the victim's testimony about how much she had to drink, she was not intoxicated to the point of being mentally incapacitated or being physically helpless. . . .
> Schiccatano has proffered expert testimony, from Dr. Nicholas T. Lappas, a forensic toxicologist, regarding the victim's possible blood alcohol level. Significantly, this evidence was based on the testimony of the victim at trial. At trial the victim testified that she "was just so incoherent. [She] couldn't move. [She] couldn't do anything. (Tr. 1/21/2015 at 210–11.) Yet, it is the recollections of this witness on which petitioner relied in an attempt to establish whether the victim was "intoxicated." The proffered expert testimony is that the victim drank one margarita (of unknown strength) and up to a 1/3 of a second one, two or three shots of Jagermeister, and ½ a bottle of beer. Based on those assumptions, the victim expected BAC level would have been between .01 and .15. (Pet. at 56.)
> However, the petitioner's own statements undermine the expert's opinion. He told the police that he "poured at least 2 shots and there were a lot of shots after that . . . I'm thinking ten at least." (Pet. Ex. 29, Interview

17

with Def. Younce at 7, App. at 204). He told the police that for an hour and half before going to the bar they were drinking, "Again, drinks, shots, drinks, shots" (Ex. 29 at 8–9, App. 206). Schiccatano told the police, after returning to the house they "finished the tequila bottle off and then [the victim] wanted to do more Jager," and the petitioner "poured it." (Ex. 29 at 11, App. at 208). The petitioner's version of the evening, related the next morning, involved significantly more alcohol than the victim's testimony. Importantly, the petitioner had not proffered what the victim's BAC would have been under the petitioner's scenario for the evening.[8] The victim's testimony about how she was in and out of consciousness along with the photographs of her that night [with her head in the toilet], establish that the petitioner's version to the police was far more likely to be accurate than the victim's unsure recollections. However, even under the petitioner's proffer, the victim was still close to twice the legal limit for driving.

A reasonable trial attorney would prefer that the issue of BAC remain vague and not attempt to establish, with any precision, what the victim's BAC actually was. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. There was no definitive testimony regarding how much alcohol was consumed and such an attempt would have emphasized the differences between the petitioner's statements to the police and his markedly different testimony at trial. Also, the Commonwealth would have likely presented evidence of what the victim's BAC would have been under the petitioner's initial version of the evening. A reasonable attorney could conclude that it was in the petitioner's best interest to keep the issue vague, which would permit wide latitude during closing argument. Had the Commonwealth presented evidence, which it could have done, of a significantly higher BAC then what petitioner proffers, that would have been very damaging to his possible defense. Merely because the reasonable strategy of trial counsel ultimately did not prevail, that is not a basis to conclude she was ineffective. *See Lawrence v. Branker*, 517 F.3d 700, 716 (4th Cir. 2008) ("effective trial counsel cannot always produce a victory for the defendant"). For the above reasons, and reasons stated to the record at the February 6, 2020 motions hearing, the petitioner has failed to establish either deficient performance or prejudice as required by *Strickland* and [this claim] must fail.

---

[8] At trial, Schiccatano attempted to disavow his statement to police.

(ECF No. 13-9, at 19–22 (paragraph numbers omitted) (omission in original) (third and fourth alteration added).)  The Court discerns no unreasonable application of the law or an unreasonable determination of the facts in the Circuit Court's rejection of this claim. *See* 28 U.S.C. § 2254(d)(1)–(2).

Counsel was not deficient for failing to obtain a toxicology expert to show, that based on the victim's testimony about how much she drank, she could not have been so intoxicated as to be mentally incapacitated or physically helpless.  At best, any such testimony would have been entirely speculative and would not have helped Schiccatano's defense.  Schiccatano initially told Detective Younce that he, the victim, and Farmer drank an excessive amount of alcohol over the course of the evening.[9]  He told Detective Younce that "everybody was drunk that [he] didn't think that anybody knew what was going on."  (ECF No. 16-2, at 20.)  To the contrary, the victim testified that she had four or five drinks from the time she got to Schiccatano's house until the bar closed.  Nevertheless, the victim described herself as "definitely feeling intoxicated," and that she and Farmer were "both very drunk" on the walk home.  (ECF No. 14-5, at 3–4.)

---

[9] Schiccatano told Detective Younce that after Farmer arrived, the three had "drinks, shots, drinks, shots, and then [they] walked to L&B's 'cuz nobody could drive."  (ECF No. 12-3, at 47.)  After the bar closed, Schiccatano told Detective Younce that the victim and Farmer "wanted to do shots again" and they "finished that tequila bottle off and [the victim] wanted to do more Jager."  (ECF No. 12-3, at 49.)  Schiccatano told officers that when the victim did not come out of the bathroom, he went in to make sure she was ok and that she was "unconscious on the bathroom floor" and that he "helped her to her side so that if she vomited again, she wouldn't choke."  (ECF No. 16-2, at 11.)  Clearly, all of Schiccatano's statements that day suggested that the victim was very drunk.  Schiccatano's initial statements were bolstered by the fact that Farmer consistently stated that she was so intoxicated that she remembered very little after leaving the bar.  (ECF No. 14-10, at 14–15.)

19

Admittedly, however, the victim remembered very little of the walk home, except to say she was stumbling and incoherent, and then once she returned to the house, she remembered vomiting off the back deck and then next waking up on the bathroom floor. (ECF No. 14-5, at 1–5.)

According to Schiccatano's initial statement to Detective Younce, during the time that the victim only remembered vomiting off the back deck and then waking up on the bathroom floor, Schiccatano, the victim, and Farmer consumed more liquor including finishing a bottle of tequila and drinking more Jägermeister. Schiccatano later walked back his testimony that he and the victim were really intoxicated and matched his testimony to what the victim testified she consumed and claimed that she never appeared intoxicated. However, it was the jury's role to hear the conflicting evidence about how much alcohol was consumed, weigh it, and decide whether the victim was mentally incapacitated or physically helpless. A toxicologist assessment based on what the victim remembered drinking, as opposed to what she may have truly consumed, would have been useless and would not have aided the jury in its determination. *See Terry v. United States*, 366 F.3d 312, 316–18 (4th Cir. 2004) ("[A] weak witness or argument is not merely useless but, worse than that, may detract from the strength of the case by distracting from stronger arguments focusing attention on weaknesses.")

Even worse than being useless or detracting from the case, as the Circuit Court determined, the proffered toxicologist's testimony could have opened the door to the Commonwealth questioning the toxicologist about how intoxicated the victim would have been if he based his assessment on Schiccatano's initial statement about how much

she drank.  This would have also served to highlight the inconsistencies once again between Schiccatano's initial statement and his testimony at trial.  From this Court's review of the record, the sexual assault nurse's report noted that the victim reported taking at least four medications for migraine headaches including Sumatriptan,[10] Effexor,[11] Topamax,[12] and Gabapentin.[13]  (State Habeas Record at 905.)  The Commonwealth could have also asked the toxicologist questions about whether certain medicines that the victim reported taking could have made her more susceptible to the effects of alcohol.  Without knowing the answer, that is not a risk a reasonable counsel would likely take because it could reinforce the victim's testimony that she was too intoxicated to consent.

---

[10] Sumatriptan is used to treat acute migraine headaches.  This drug can cause dizziness or drowsiness. *See* WebMD, *Sumatriptan – Uses, Side Effects, and More,* https://www.webmd.com/drugs/2/drug-7741/sumatriptan-oral/details (last visited Dec. 1, 2024).

[11] Effexor is used to treat depression and anxiety.  Patients on Effexor should avoid alcoholic beverages because it can enhance dizziness or drowsiness. *See* WebMD, *Vanlafaxine (Effexor) – Uses, Side Effects, and More*, https://www.webmd.com/drugs/2/drug-1836/effexor-oral/details (last visited Dec. 1, 2024).

[12] Topamax or Topiramate is used to treat seizures and migraines.  Patients are advised to not drink alcohol within six hours before or after taking this medicine because it can cause dizziness and drowsiness. *See* WedMD, *Topiramate – Uses, Side Effects, and More,* https://www.webmd.com/drugs/2/drug-14494-6019/topamax-oral/topiramate-oral/details (last visited Dec. 1, 2024).

[13] Gabapentin is used to treat seizures in people with epilepsy or to treat nerve pain.  This drug may cause dizziness and sleepiness.  Patients are advised to not drink alcohol while taking because "[t]he risk for serious problems such as severe dizziness and sleepiness may be increased if you drink alcohol while taking gabapentin." *See Gabapentin – Uses, Side Effects, and More*, https://www.webmd.com/drugs/2/drug-14208-8217/gabapentin-oral/gabapentin-oral/details (last visited Dec. 1, 2024).

In sum, counsel was not deficient for failing to obtain a toxicology expert to show, that based on the victim's testimony about how much she drank, she could not have been so intoxicated as to be mentally incapacitated or physically helpless, nor was Schiccatano prejudiced. Thus, the Court discerns no unreasonable application of the law or an unreasonable determination of the facts in the Circuit Court's rejection of this claim. Accordingly, Claim B lacks merit and will be dismissed.

### III. CONCLUSION

Schiccatano's claims will be dismissed. The Motion to Dismiss (ECF No. 10) will be granted. The § 2254 Petition will be denied. The action will be dismissed. A certificate of appealability will be denied.

An appropriate Order will accompany this Memorandum Opinion.

/s/

Henry E. Hudson
United States District Judge

Date: Dec. 10, 2024
Richmond, Virginia

22